**M.J. WOODS, INC., Plaintiff,**

v.

**CONOPCO, INC., d/b/a Chesebrough–Pond's USA Co. and d/b/a Uniliver Home and Personal Care USA and Pennie & Edmonds LLP, Defendants.**

**No. 01 Civ. 3135.**

United States District Court, S.D. New York.

July 14, 2003.

H. Barry Vasios, Holland & Knight, L.L.P., New York City, for Defendants.

## DECISION AND ORDER

MARRERO, District Judge.

Plaintiff M.J. Woods, Inc. ("MJW") filed a complaint (the "Complaint") against Defendants Conopco, Inc. ("Conopco") and Pennie & Edmonds LLP ("P & E," and together with Conopco, "Defendants") (1) seeking an order commanding the Director of the United States Patent and Trademark Office to correct a certain patent owned by Conopco; (2) alleging that Conopco (i) violated Section 43(a)(1) of the Lanham Act, 15 U.S.C. § 1125(a)(1) and (ii) breached a confidentiality agreement between MJW and Conopco; (3) alleging that P & E committed legal malpractice in

the course of its purported attorney-client relationship with MJW (the "Malpractice Claim"); and (4) contending that Defendants' conduct constituted (i) unfair competition under New York and Connecticut law and (ii) misappropriation of trade secrets under New York and Connecticut law (the "State Claims").

On July 23, 2001, the Court stayed the action between MJW and Conopco pending determination of all issues in an arbitration (the "Conopco Arbitration"). On November 2, 2001, the Court stayed the action between MJW and P & E pending determination of all issues in an arbitration (the "P & E Arbitration," and together with the Conopco Arbitration, the "Arbitrations") except the Malpractice Claim. Bud Holman (the "Arbitrator"), a senior partner at a major New York City law firm, conducted the Arbitrations.

The Arbitrator rendered his decision in an Award of Arbitrator, dated January 17, 2003 (the "Award"). In the Award, the Arbitrator found, *inter alia*, that Defendants had not breached or misused any confidential information nor had they misappropriated any trade secrets. By stipulation dated April 9, 2003, MJW and Conopco agreed to confirm the Award as to all claims between MJW and Conopco only.

P & E subsequently filed a motion (the "Motion") pursuant to Sections 9 and 13 of the Federal Arbitration Act (the "FAA"), 9 U.S.C. §§ 9 and 13, asking the Court to confirm the Award in the P & E Arbitration and enter judgment in favor of P & E dismissing with prejudice the State Claims and, pursuant to Rule 56 of the Federal Rules of Civil Procedure, to grant summary judgment dismissing the Malpractice Claim under the doctrine of collateral estoppel. MJW opposed the Motion both to the extent that the Award could be used to include a determination of any of the is-

sues found in the Malpractice Claim and because of P & E's request for summary judgment. For the reasons set forth below, the motion is GRANTED.

## I. *FACTUAL BACKGROUND*

MJW is a closely held California corporation that licenses inventions patented by its founders and principal shareholders, James and Susan Woods (the "Woods"). Conopco is a subsidiary of Unilever USA, Inc., which is the United States subsidiary of the multinational consumer and food product manufacturer, Unilever Corporation. In April 1997, MJW contacted Conopco to inquire whether Conopco would be interested in licensing certain patents (the "Patents") that MJW owned related to the manufacture and use of multi-layered laminated pads with a graspable handle (the "Invention"), designed for nail polish removal and the application of cosmetics, among other things. By this point, MJW had already been unsuccessful in its efforts to license the Patents to other major companies.

Conopco agreed to meet with MJW to discuss the Invention and the possibility of licensing the Patents, but prior to the meeting, Conopco and MJW entered into a written confidentiality agreement, dated May 7, 1997 (the "Confidentiality Agreement"), in order to keep confidential any information MJW shared with Conopco regarding the Invention and the Patents. The two companies first met on May 13, 1997 at Conopco's offices in Connecticut. The meeting was attended by the Woods, Bill Schmitt, Conopco's Vice President of Research and Development, Joseph Zygmont ("Zygmont"), a Principal Research Scientist at Conopco, and some other Conopco research and marketing employees.

P & E had not yet been involved in the matter, and consequently no one from P & E attended. Following this meeting, negotiations continued throughout the summer and fall of 1997 over the possible licensing of the Patents. During this time, on June 11, 1997, MJW also showed Conopco a pending patent application for a pad with a two-piece handle, known as a "wings" design (the "Pending Patent").

These discussions culminated in a draft license agreement written by Conopco, which Conopco sent to MJW in early October of 1997. At this stage, MJW brought in an experienced licensing attorney, Robert Goldscheider ("Goldscheider"), to assist in negotiating the agreement. The following month, Conopco, which had utilized its in-house patent counsel when reviewing the Patents, turned to P & E, its longtime patent counsel, after realizing that the prior art and file wrappers[1] of previously issued patents could instruct skilled competitors on how to construct a product similar to the Invention, thus potentially rendering the Patents useless. Conopco hoped that P & E could assist Conopco and MJW in broadening and strengthening the method of use claims under the Pending Patent in order to better protect the Invention from competitors if Conopco proceeded to license the Patents.

For the next three months, Conopco, represented by P & E, and MJW, represented by Goldscheider, continued discussions about licensing the Patents. During a February 10, 1998 meeting between Conopco and MJW at P & E's offices, the parties discussed broadening the Pending Patent and MJW agreed to let P & E make an attempt at drafting a broader claim. However, MJW later abandoned

---

**1.** Prior art is defined as "any relevant knowledge, acts, descriptions and patents which pertain to, but predate, the invention in question." Black's Law Dictionary 1193 (6th ed.1990). File wrappers are defined as "[t]he written record of the preliminary negotiations between an applicant and the Patent Office for a patent monopoly contract." *Id.* at 628.

this more expansive claim on the advice of Goldscheider. During this same three month period, Zygmont developed an idea to improve the Patents that he purportedly based on previous patents held by companies other than MJW. Conopco engaged P & E to prepare a patent application based on Zygmont's design (the "Zygmont Patent Application"). Conopco contends that despite similarities between the Zygmont Patent Application and the Pending Patent, Zygmont was not aware of the Pending Patent and the P & E attorney who prepared the Zygmont Patent Application did not review the Pending Patent. The parties agree that the broader claim that MJW abandoned would have barred the Zygmont Patent Application.

On April 17, 1998, MJW and Conopco entered into a licensing agreement (the "Licensing Agreement"), pursuant to which MJW received several payments over the next five months. During this period, Conopco conducted several market research studies involving the Invention and variations on it, and concluded that potential annual sales were far below the minimum needed to proceed commercially. As a result, in September 1998, Conopco decided to terminate the Licensing Agreement.

A year and a half later, the Zygmont Patent Application was approved and resulted in the issuance of a patent in April 2000 (the "Zygmont Patent"). The instant litigation ensued, with MJW's Complaint alleging that Defendants misled MJW while preparing and obtaining the competitive Zygmont Patent using confidential information about the Pending Patent gathered during the term of the Confidentiality Agreement. MJW contends that these actions violated the Confidentiality Agreement and accuses Defendants of, *inter alia*, unfair competition and misappropriation of trade secrets. MJW also alleges

that P & E committed legal malpractice in the process.

## II.  *DISCUSSION*

In the Motion, P & E first asked the Court to confirm the Award in the P & E Arbitration and enter judgment in favor of P & E dismissing with prejudice the State Claims. While MJW does not oppose confirmation of the Award, it does argue that to the extent the Award included a determination of any issue pertaining to the Malpractice Claim, it was beyond the scope of the authority of the Arbitrator and should not be confirmed. P & E also moved for summary judgment on the Malpractice Claim, arguing that the Arbitrator's findings on several of the elements of the Malpractice Claim have preclusive effect under the doctrine of collateral estoppel and thus require the dismissal of the Malpractice Claim. MJW contends that P & E has not made a persuasive case for summary judgment because it has failed to establish that the doctrine of collateral estoppel is applicable to defeat the Malpractice Claim. As both arguments involve the doctrine of collateral estoppel, the Court proceeds to discuss that doctrine first before addressing either argument.

## A.  *COLLATERAL ESTOPPEL*

■ The doctrine of collateral estoppel—also known as issue preclusion—operates almost identically under federal and New York State law by barring "the relitigation of an issue that was raised, litigated, and actually decided by a judgment in a prior proceeding, regardless of whether the two suits are based on the same cause of action." *Postlewaite v. McGraw–Hill, Inc.*, 333 F.3d 42, 47–48 (2d Cir.2003); *see also Buechel v. Bain*, 97 N.Y.2d 295, 740 N.Y.S.2d 252, 766 N.E.2d 914, 919 (2001), *cert. denied*, 535 U.S. 1096, 122 S.Ct. 2293, 152 L.Ed.2d 1051 (2002); 18 James WM.

Moore *et al., Moore's Federal Practice* § 132.01[2], at 132–11 (3d ed. 2001) ("When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim."); 10 Jack B. Weinstein *et al., New York Civil Practice: CPLR* ¶ 5011.23, at 50–154 (2003) ("[C]ollateral estoppel rests on the principle that issues necessarily decided by a court of competent jurisdiction remain binding on the parties and their privies in any subsequent litigation that does not involve the same cause of action and in which those same issues are material."). Courts have justified the doctrine based on its ability "to reduce litigation and conserve the resources of the court and litigants," noting that "it is not fair to permit a party to relitigate an issue that has already been decided against it." *Kaufman v. Eli Lilly & Co.*, 65 N.Y.2d 449, 492 N.Y.S.2d 584, 482 N.E.2d 63, 67 (1985); *accord Beatus v. Gebbia*, 4 F.Supp.2d 256, 259 (S.D.N.Y. 1998).

■ To invoke collateral estoppel, the party alleging issue preclusion must show that an issue of fact or law was litigated and actually decided in a prior proceeding, during which the non-moving party had a full and fair opportunity to litigate the issue. *See Metromedia Co. v. Fugazy*, 983 F.2d 350, 365 (2d Cir.1992). The issue must have been identical to the issue decided in the prior proceeding, *see Green v. Montgomery*, 219 F.3d 52, 55 (2d Cir. 2000), and "the decision of the issue [must have been] necessary to support a valid and final judgment on the merits." *Metromedia*, 983 F.2d at 365.

It has become well-settled that collateral estoppel applies to issues resolved in arbitration, assuming there has been a "final determination on the merits, notwithstanding a lack of confirmation of the award." *Jacobson v. Fireman's Fund Insurance Co.*, 111 F.3d 261, 267–68 (2d Cir.1997) (citation and internal quotation marks omitted); *see also Beatus*, 4 F.Supp.2d at 260 ("Collateral estoppel can be applied to a confirmed arbitration award entered as a final judgment."); *American Ins. Co. v. Messinger*, 43 N.Y.2d 184, 401 N.Y.S.2d 36, 371 N.E.2d 798, 801 (1977).

In the final analysis, in applying collateral estoppel under New York practice, it is worth bearing in mind the observation of the New York of Appeals that:

> The doctrine ... is a flexible one, and the enumeration of these elements is intended merely as a framework, not a substitute for case-by-case analysis of the facts and realities. "In the end, the fundamental inquiry is whether relitigation should be permitted in a particular case in light of ... fairness to the parties, conservation of the resources of the court and the litigants, and the societal interests in consistent and accurate results. No rigid rules are possible, because even these factors may vary in relative importance depending on the nature of the proceedings...."

*Buechel*, 740 N.Y.S.2d 252, 766 N.E.2d at 919 (quoting *Staatsburg Water Co. v. Staatsburg Fire Dist.*, 72 N.Y.2d 147, 531 N.Y.S.2d 876, 527 N.E.2d 754, 756 (1988) (internal citations omitted)).

## B. *CONFIRMATION OF THE AWARD*

■ Enacted in 1925, the FAA marked a reversal of centuries of judicial antipathy towards arbitration agreements. *See DaPuzzo v. Globalvest Management Co., L.P.*, 263 F.Supp.2d 714, 721–22 (S.D.N.Y. 2003). Once the FAA was adopted, federal policy shifted to favor arbitration, and over the next several decades, a federal court's ability to review an arbitration decision was significantly limited. *See Sperry Int'l Trade, Inc. v. Gov't of Israel*, 689

F.2d 301, 304 (2d Cir.1982) ("It is beyond cavil that the scope of [a] district court's review of an arbitration award is limited."). As the law now stands, absent a compelling reason or some manifest disregard of law, the Court must confirm an arbitration award. *See* 9 U.S.C. § 9; *Decicco v. Colombo,* 234 F.Supp.2d 320, 322 (S.D.N.Y. 2002).

■■■ MJW offers no such reasons to oppose the Award, and in fact did not seek to modify, vacate or correct the Award within the three-month limitation period as set forth in Section 12 of the FAA. *See* 9 U.S.C. § 12. "The Second Circuit has made clear that there is no exception to this three month limitation period." *Kruse v. Sands Brothers & Co., Ltd.,* 226 F.Supp.2d 484, 486 (S.D.N.Y.2002). To allow for broader judicial review or a longer time to appeal would "undermin[e] the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." *Folkways Music Publishers, Inc. v. Weiss,* 989 F.2d 108, 111 (2d Cir.1993). Thus, the Court is compelled to confirm the Award pursuant to 9 U.S.C. § 9 as to all claims resolved therein as between MJW and P & E and enter final judgment pursuant to 9 U.S.C. § 13, dismissing with prejudice Causes of Action Three, Four, Five and Six in the Complaint in favor of P & E.

■■ MJW's argument that any determination of issues pertaining to the Malpractice Claim exceeds the scope of the Arbitrator's authority is without merit. Assuming the Court were to find that the Award, in resolving the matters indisputably within the scope of the Arbitrations, necessarily embodied a determination of issues that also constitute requisite elements of a malpractice claim under New York law, such a finding does not lead to

the conclusion that the Award superseded the boundaries of the Arbitrator's authority. As discussed above, the doctrine of collateral estoppel permits a court to treat previously litigated issues as conclusive determinations of fact, even if the court is presented in another action with a separate claim different from the one in which the issues were previously litigated. Moreover, a court can treat such issues as conclusive even if they were decided during an arbitration, whether the award is confirmed or unconfirmed. *See Jacobson,* 111 F.3d at 267–68 (unconfirmed); *American Ins.,* 401 N.Y.S.2d 36, 371 N.E.2d at 801 (confirmed).

As a result, while the Arbitrations were not authorized to explicitly address the Malpractice Claim, certain issues that comprise the pertinent elements of the Malpractice Claim necessarily had to be decided by the Arbitrator in order to render judgment in regard to MJW's other claims that were properly before him. By considering these issues in ruling on the Motion, the Court is not in any way giving binding and preclusive effect to any final judgment made by the Arbitrator on an entire claim now before the Court, as would occur if P & E were arguing that res judicata barred the Malpractice Claim altogether from being heard by the Court.[2] Rather, to properly analyze the Malpractice Claim, the Court is considering issues the Arbitrator necessarily decided when resolving the separate disputes that comprised the Arbitrations. As a result, the Court remains within the bounds of its authority to confirm the Award as a whole.

### C. *P & E'S MOTION FOR SUMMARY JUDGMENT*

In the Motion, P & E argues that if at least one of the issues of fact or law need-

---

**2.** Res judicata—also known as claim preclusion—"prevents a party from suing on a claim which has been previously litigated to a final

judgment by that party or such party's privies...." 18 Moore, *supra,* § 131.10[1][a], at 131–15.

ed to establish a legal malpractice claim was necessarily determined in the Arbitrations, and during those Arbitrations, MJW had a full and fair opportunity to litigate such issues, then the doctrine of collateral estoppel bars the relitigation of that issue, and the Malpractice Claim must be dismissed as a matter of law. MJW counters that none of the elements of the Malpractice Claim were actually or necessarily determined in the Arbitrations and the Award has no preclusive effect because it is unreviewable, and therefore this Court should continue to hear both parties on the Malpractice Claim.

### 1. *Standard of Review*

A motion for summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding whether a genuine issue of material fact exists, a district court must "examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party." *In re Chateaugay Corp.,* 10 F.3d 944, 957 (2d Cir.1993).

■ When a defendant attempts "[t]o obtain summary judgment on collateral estoppel grounds" based on an arbitration award, the defendant "must make a showing so strong that no fair-minded jury could fail to find that the arbitrator necessarily denied the claim for the reason they assert." *BBS Norwalk One, Inc. v. Raccolta, Inc.,* 117 F.3d 674, 677 (2d Cir.1997). The Second Circuit has noted that such a burden is a heavy one "that cannot be met with evidence that is 'equivocal.'" *Postle-*

*waite,* 333 F.3d 42, 49–50. Instead, "the party asserting preclusion bears the burden of showing with clarity and certainty what was determined by the prior judgment," and collateral estoppel "will apply only if it is quite clear that this requirement has been met." *BBS Norwalk One, Inc.,* 117 F.3d at 677 (internal quotation marks omitted).

### 2. *Legal Malpractice Under New York Law*

■ Under New York law, a plaintiff must prove four elements to successfully allege a claim of legal malpractice: (1) the existence of an attorney-client relationship; (2) negligence on the part of the attorney or some other conduct in breach of that relationship; (3) that the attorney's conduct was the proximate cause of injury to the plaintiff; and (4) that but for the alleged malpractice the plaintiff would have been successful in the underlying action. *Estate of Re v. Kornstein Veisz & Wexler,* 958 F.Supp. 907, 920 (S.D.N.Y.1997) (citing *Sloane v. Reich,* No. 90 Civ. 8187, 1994 WL 88008, at *3 (S.D.N.Y. March 11, 1994)). The plaintiff must prove the existence of such injury by a showing of "actual damages." *See D'Jamoos v. Griffith,* No. 00 Civ. 13612001, 2001 WL 1328592, at *5–6 (E.D.N.Y. Aug. 1, 2001).

### 3. *Application of Collateral Estoppel to the Issues Litigated During the Arbitration*

As discussed above, the Court must determine whether issues identical to the elements of the Malpractice Claim were actually litigated and necessarily determined during the Arbitrations, and whether MJW had a full and fair opportunity to litigate such issues. As part of this inquiry, the Court must consider whether the issues decided by the Arbitrator were

584

identical to the elements of the Malpractice Claim. MJW contends that the Arbitrator did not actually determine whether (i) there was an attorney-client relationship between P & E and MJW, (ii) P & E breached the applicable standard of conduct in that purported relationship, or (iii) that breach caused actual damages to MJW.

■ The Court disagrees. While the Court did not grant P & E's request to arbitrate the Malpractice Claim, the Arbitrator inevitably had to address the elements that comprise a New York legal malpractice claim in order to rule on the State Claims. For example, the Arbitrator found the State Claims to be completely meritless with respect to P & E in part because of "the fact that [P & E] was engaged not by [MJW], but by Conopco, a long-time client in an accepted, not unusual practice, to advise, on behalf of a prospective licensee, a prospective licensor with respect to strengthening its claims for the protection of the prospective licensee...." (Award, attached as Exhibit N to Appendix of Exhibits to Declaration of H. Barry Vasios In Support of Defendant Pennie & Edmonds LLP's Motion to Confirm an Arbitration Award and for Summary Judgment ("Appendix"), at 9.)

Evaluating the nature of the relationship between MJW and P & E and the extent of P & E's duty to MJW as a result of such a relationship, if it existed at all, was a necessary step for the Arbitrator in assessing P & E's fiduciary duty to MJW. *See, e.g., Katz Dochrermann & Epstein, Inc. v. Home Box Office,* No. 97 Civ. 7763, 1999 WL 179603, at *4 (S.D.N.Y. Mar. 31, 1999) (noting that "an abuse of a fiduciary or confidential relationship" is at "[t]he essence of an unfair competition claim under New York law"); *Hudson Hotels Corp. v. Choice Hotels Int'l,* 995 F.2d 1173, 1176 (2d Cir.1993) (noting that a showing of a "confidential relationship or duty" that was

breached by the use of a trade secret will help a party "succeed on a claim for the misappropriation of trade secrets under New York law"). Thus, in the Award, the Arbitrator had to consider and rule on the identical issue of attorney-client relationship that underlies the Malpractice Claim. In any event, as a final note on this point, the Court considers the Second Circuit's observation that:

> [t]he prior decision need not have been explicit on the point, since "[i]f by necessarily implication it is contained in that which has been explicitly decided, it will be the basis for collateral estoppel."

*BBS Norwalk,* 117 F.3d at 677 (quoting *Norris. v. Grosvenor Mktg. Ltd.,* 803 F.2d 1281, 1285 (2d Cir.1986)).

MJW insists that despite such a ruling, the Arbitrator did not necessarily find the absence of an attorney-client relationship between MJW and P & E. Instead, MJW notes that New York law considers attorney-client privilege to attach "when a person consults with an attorney in confidence, for the purpose of obtaining legal services." *Brandman v. Cross & Brown Co. of Florida, Inc.,* 125 Misc.2d 185, 479 N.Y.S.2d 435, 437 (N.Y.Sup.Ct.1984); *see also Waggoner v. Snow, Becker, Kroll, Klaris & Krauss,* 991 F.2d 1501, 1504 (9th Cir.1993) (interpreting New York law as saying that "[a]n attorney-client relationship is formed when an attorney renders advice directly to a client who has consulted him seeking legal counsel."). Thus, MJW highlights the Arbitrator's use of the verb "advise" to make the argument that the Arbitrator's findings could support the view that an attorney-client relationship was formed between MJW and P & E, despite the absence of a formal contract. *Id.* ("A formal contract is not necessary to show that an attorney-client relationship has been formed.").

However, MJW's argument ignores the subtlety of settled case law on the matter. The simple act of an attorney giving advice to an individual does not automatically create an attorney-client relationship. *See id.* (rejecting former CEO's claim of an attorney-client relationship between him and corporation counsel despite fact that said counsel had offered advice to CEO regarding CEO's preferred stock transaction). Instead, a court must look to the general character of the relationship, and courts have articulated certain factors that may be considered in determining the existence of an attorney-client relationship, including:

1) whether a fee arrangement was entered into or a fee paid; 2) whether a written contract or retainer agreement exists indicating that the attorney accepted representation; 3) whether there was an informal relationship whereby the attorney performed legal services gratuitously; 4) whether the attorney actually represented the individual in an aspect of the matter (e.g., at a deposition); 5) whether the attorney excluded the individual from some aspect of a litigation in order to protect another (or a) client's interest; 6) whether the purported client believed that the attorney was representing him and whether this belief was reasonable.

*First Hawaiian Bank v. Russell & Volkening, Inc.*, 861 F.Supp. 233, 238 (S.D.N.Y. 1994) (internal citations omitted); *see also Heine v. Colton, Hartnick, Yamin & Sheresky*, 786 F.Supp. 360, 366 (S.D.N.Y. 1992) (noting that "the absence of a fee arrangement is a general indication that no attorney-client relationship has been established").

It is undisputed that P & E was paid by Conopco, not MJW, and had no type of contract or agreement with MJW. Moreover, P & E did not represent MJW in any kind of official dealings—indeed, during the negotiations over the Licensing Agreement, MJW was represented by Goldscheider. MJW asserts that a more formal relationship existed between it and P & E because P & E was working directly for MJW to broaden MJW's patent protection, an action that allegedly would directly benefit MJW and only indirectly benefit Conopco. In fact, MJW has this argument backwards—stronger patent protection would directly benefit Conopco by ensuring that the license it wanted to obtain was broad enough to be effective, and MJW would only indirectly benefit by the improvement of the Patents, which were not guaranteed to be used in the future by licensees other than Conopco.

In addition, there is no evidence on the record before the Court that an informal relationship had formed between MJW and P & E whereby P & E rendered legal services to MJW for free. Thus, evaluating the *First Hawaiian* factors and considering them in conjunction with the Arbitrator's observation that it is standard practice for potential licensors to meet with the counsel of their prospective licensees in order to discuss strengthening the claim for protection of the prospective license, the Court is persuaded that MJW could not have had a reasonable belief that P & E was its attorney. Consequently, the Arbitrator's finding that MJW's allegations of unfair competition and misappropriation of trade secrets against P & E were without merit directly addressed the issue of attorney-client relationship, and without the existence of such a relationship, it is impossible that P & E could have breached any standards of conduct with regard to such a relationship.

The Arbitrator also found that P & E's actions did not "inflict any demonstrable harm on" MJW, which directly implicates the identical issue of actual damages that must be proved to succeed on a New York legal malpractice claim. (Award, attached

**586**

as Exh. N to Appendix, at 9.) MJW avers that such a finding by the Arbitrator did not address damages applicable in a malpractice action, such as the costs MJW incurred to recover the Zygmont Patent,[3] to the extent that such litigation was required in part because of P & E's alleged breach of its duties to MJW. The Court disagrees. Not only does the Award establish that P & E owed no duty to MJW, but it completely exonerates P & E, implicating only Conopco in improper behavior that forced MJW to resort to legal proceedings. Thus, the Award addressed all damages that could be applicable in this matter, and found P & E responsible for none of them.

MJW's other arguments also fail. MJW asserts that even if the issues decided in the Arbitrations were identical to those involved in the Malpractice Claim, their determinations were not necessary because they were not officially before the Arbitrator. Once again, MJW confuses issue preclusion with claim preclusion. While the Arbitrator was not authorized to rule on the claim of legal malpractice, his findings with regard to elements of the Malpractice Claim have preclusive effect under the doctrine of collateral estoppel. Thus, his findings on issues such as attorney-client relationship and damages require the Court to dismiss the Malpractice Claim as a matter of law.

■ Additionally, MJW's argument that the Award has no preclusive effect under the doctrine of collateral estoppel because it cannot be appealed or reviewed for correctness is patently incorrect. As discussed above, the doctrine of collateral estoppel applies to arbitration awards, whether they are unconfirmed awards, *see Jacobson,* 111 F.3d at 267, or confirmed awards. *See Beatus,* 4 F.Supp.2d at 260. For this Court to rule otherwise would be to upset decades of federal precedent that gives preclusive effect to arbitration decisions.

■ Moreover, MJW had the opportunity to contest the Award and ask for the Court's review, but chose not to do so. Therefore, the Award is not the type of unreviewable judgment that the Restatement (Second) of Judgments held had no preclusive effect. *See Restatement (Second) of Judgments* § 28 cmt. a (1982). While the review may be limited, there is still the opportunity for such review, unlike unreviewable judgments made in other cases. *See, e.g., Lombardi v. City of El Cajon,* 117 F.3d 1117, 1122 (9th Cir.1997) (finding that because plaintiff won judgment in a suppression hearing in a related case and therefore could not have appealed an issue in the judgment that was adverse to plaintiff, such issue did not have preclusive effect). Thus, the Court rejects MJW's argument.

Finally, the Court notes that the Arbitrations—conducted over several weeks by able counsel on both sides, encompassing thousands of pages of legal briefs and discovery documents, and involving the direct and cross examination of nine witnesses—clearly offered MJW a full and fair opportunity to argue its case before an experienced trier of fact. Thus, the Court is persuaded that "MJW had more than a sufficient chance to debate the merits of its claims, and that this opportunity was full and fair" as required under the doctrine of collateral estoppel. As a result, the Court finds no reason to discount the findings that resulted from the Arbitrations.

---

**3.** Despite finding that Defendants had not breached or misused any confidential information or misappropriated any trade secrets, the Arbitrator found Conopco's actions deceitful enough to warrant ordering the transfer of the Zygmont Patent from Conopco to MJW. (*See* Award, Exh. N to Appendix, at 9–10.)

## III. *ORDER*

For the reasons described above, it is hereby

**ORDERED** that Pennie & Edmonds' motion to confirm the Award and for summary judgment dismissing MJ Woods' claim of legal malpractice is granted.

The Clerk of Court is directed to close this case.

**SO ORDERED.**