131 T.C. No. 15

UNITED STATES TAX COURT

LARRY G. AND MARIA A. WALTON MITCHELL, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 2518-04.                    Filed December 15, 2008.

      P-W received distributions during 2001 made pursuant to
a QDRO after her ex-husband retired from the U.S. Air Force.
Ps did not include the 2001 distribution in income when they
filed their joint 2001 Federal tax return.  R issued a
notice of deficiency in which he determined that Ps were
liable for income tax on the distribution.

      <u>Held</u>:  Distributions received by P-W are income to P-W
and are includable in petitioners' taxable income.


Larry G. and Maria A. Walton Mitchell, pro se.

<u>Michael R. Skutley</u>, for respondent.

OPINION

GOEKE, Judge:[1]  Respondent determined a deficiency of $1,471 in petitioners' Federal tax for 2001.  The issue for decision is whether $5,126 received by petitioner Maria A. Walton Mitchell (petitioner) for her interest in her former husband's military retired pay is includable in her  gross income.  For the reasons stated herein, we hold that it is.

Background

The following facts are stipulated or are not disputed by the parties.  The parties' stipulation of facts and the accompanying exhibits are incorporated herein by this reference.

Petitioners resided in California at the time that the petition was filed.

Before her marriage to Larry G. Mitchell, petitioner was married to Bobbie Leon Walton.  At the time of their marriage, Mr. Walton was on active duty in the U.S. Air Force (USAF).  Mr. Walton and petitioner separated in 1985.  Pursuant to a final judgment entered by the Superior Court of the State of California (superior court) their divorce became final on August 29, 1986. On August 1, 1990, Mr. Walton retired from the USAF after 26 years on active duty and began receiving military retired pay. Petitioner subsequently petitioned the superior court with

_____

[1]This case was reassigned to Judge Joseph R. Goeke by order of the Chief Judge.

respect to her interest in Mr. Walton's military retired pay.  On
January 2, 1991, the superior court entered an order (order)
which stated in pertinent part:

> 2.  Servicemember [Mr. Walton] retired from the United
> States Air Force on August 1, 1990, with fully vested
> retirement rights and benefits, a portion of which are
> community property of Servicemember and of Servicemember's
> former spouse,
>
> *     *     *     *     *     *     *
>
> 4. * * * [Petitioner] is now entitled to an order
> dividing the military retirement to the extent same was
> earned by Servicemember during the marriage to * * * [her].
>
> *     *     *     *     *     *     *
>
> 8. * * * [Petitioner] shall be awarded as her sole and
> separate property, one-half (1/2) of the community property
> interest in Servicemember's net disposable military
> retirement pay as set forth in the California case of
> Mansell v. Mansell decided by the U.S. Supreme Court on May
> 30, 1989, wherein the net disposable military retirement pay
> is defined as the net after deducting (a) amounts owned
> [sic] by the military member to the United States; (b)
> required by law to be deducted from total pay, including
> employment taxes, and fines and forfeitures ordered by
> courts-martial; (c) properly deducted from Federal, State
> and [sic] income taxes; (d) withheld pursuant to other
> provisions under the Internal Revenue Code; (e) deducted to
> pay government life insurance premiums; and (f) deducted to
> create an annuity for the former spouse (10 U.S.C. #1408
> (a)-(4)-(A)-(F)).
>
> 9.  The community property interest in the
> Servicemember's net disposable retirement pay is determined
> to be 48.7%.
>
> 10. * * * [Petitioner's] interest in Servicemember's
> net disposable retirement pay is determined to be 24.35%.

Attached to the order was a factsheet titled "DIRECT PAYMENTS FROM U.S. AIR FORCE RETIRED PAY PURSUANT TO THE UNIFORMED SERVICES FORMER SPOUSES' PROTECTION ACT" (factsheet). The factsheet stated in pertinent part:

> j.  Taxes may be held only from the Air Force retiree's pay.  Funds may not be held for taxes from the ex-spouses portion.  For further information, we refer you to the nearest Internal Revenue Service office.

Sometime in 1991 petitioner began receiving monthly payments from the Defense Finance and Accounting Service (DFAS) for her interest in Mr. Walton's military retired pay pursuant to the order.  For the taxable year 2001 she received payments from DFAS in the aggregate amount of $5,126.  DFAS issued to petitioner a Form 1099-R, Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc., for the taxable year 2001 which reported both the gross distribution and the taxable amount as $5,126 and the amount of Federal income tax withheld as zero.

Petitioners timely filed a joint Form 1040, U.S. Individual Income Tax Return, for 2001 but did not report the $5,126 distribution that petitioner received from DFAS.  On November 10, 2003, respondent issued to petitioners a notice of deficiency for the taxable year 2001.  In the notice respondent determined that petitioners failed to report the $5,126 in their gross income.

On February 9, 2004, petitioners filed an imperfect petition.  On March 26, 2004, petitioners filed an amended

petition alleging that taxes were to be taken into account before petitioner was issued her share of Mr. Walton's retirement benefits and that if petitioner's share were taxed, it would be subject to double taxation.

A trial was held on June 24, 2005, in Los Angeles, California.

## Discussion

Petitioners argue that taxes should have been withheld on the entire amount of the pension payments disbursed to Mr. Walton before petitioner was paid her share. Petitioners maintain that if petitioner is required to pay Federal income tax on her share, then Mr. Walton's pension is being subject to double taxation, both on disbursement to Mr. Walton and again when petitioner receives her share. Respondent argues that tax was withheld only on Mr. Walton's share of the military pay, not on petitioner's share.[2]

Petitioner's interest in the military retired pay was determined according to the laws of the State of California. In the State of California, community property principles apply in

---

[2]On Nov. 23, 2004, this Court issued an opinion in Mitchell v. Commissioner, T.C. Summary Opinion 2004-160. That dealt with a substantially similar issue for petitioners' 2000 tax year. Respondent also raised collateral estoppel several weeks before trial, relying on that case. Because this case was tried and presents a legal issue on the basis of largely uncontested facts, we decide the case on the merits and do not reach respondent's collateral estoppel argument.

divorce proceedings.  Consistent with these principles, each spouse is considered to have a one-half ownership interest in all property earned by either spouse during the marriage.  See Cal. Fam. Code sec. 2550 (West 2004).  In McCarty v. McCarty, 453 U.S. 210 (1981), the Supreme Court held that the Federal statutes then governing military retirement pay prevented State courts from treating military retirement pay as community property.  In response to McCarty, Congress enacted in 1982 the Department of Defense Authorization Act, 1983, Pub. L. 97-252, sec. 1002, 96 Stat. 730 (1982), which added section 1408 to title 10 of the United States Code.  Under 10 U.S.C. sec. 1408(c)(1) (2006), a State court may treat disposable military retired pay in a divorce proceeding either as property solely of the servicemember or as property of the military retiree and his or her spouse in accordance with the law of the jurisdiction of the court.  If a divorce was effective before February 3, 1991, only the disposable retired pay, which is the total monthly retired pay to which a member is entitled less, inter alia, amounts properly withheld for Federal, State, or local income taxes, may be treated as the property of the member and his spouse.  10 U.S.C. sec. 1408(a)(4) (1988); National Defense Authorization Act for Fiscal Year 1991 (NDAA), Pub. L. 101-510, sec. 555(b)(3), (e)(2), 104 Stat. 1569, 1570 (1990).

Under California law post-McCarty, military retirement benefits earned during marriage are community property. Casas v. Thompson, 720 P.2d 921, 925 (Cal. 1986); see Gillmore v. Gillmore, 629 P.2d 1, 3 (Cal. 1981).

While State law determines the nature of a property interest, Federal law determines the Federal taxation of that property interest. United States v. Mitchell, 403 U.S. 190 (1971). Furthermore, the tax liability for income from property attaches to the owner of the property. Eatinger v. Commissioner, T.C. Memo. 1990-310 (citing Helvering v. Clifford, 309 U.S. 331, 334 (1940), Blair v. Commissioner, 300 U.S. 5, 12 (1937), Poe v. Seaborn, 282 U.S. 101 (1930), and Lucas v. Earl, 281 U.S. 111 (1930)).

As a general rule, the Internal Revenue Code imposes a tax on the taxable income of every individual. See Sec. 1. For purposes of calculating taxable income, section 61(a) defines gross income as "all income from whatever source derived" unless otherwise specifically excluded. Gross income specifically includes amounts derived from pensions. Sec. 61(a)(11). Military retired pay constitutes a pension within the meaning of that section. See Eatinger v. Commissioner, supra ("A military retirement pension, like other pensions, is simply a right to receive a future income stream from the retiree's employer."); sec. 1.61-2(a)(1), Income Tax Regs.; sec. 1.61-11(a), Income Tax

Regs. ("Pensions and retirement allowances paid either by the Government or by private persons constitute gross income unless excluded by law."); see also 10 U.S.C. 1461(a) (2006) (defining the Department of Defense Military Retirement Fund).

Under section 402(a) a pension distribution is normally taxed to the distributee. Pursuant to section 402(e)(1)(A), the spouse or former spouse is treated as the distributee with respect to distributions allocated to that spouse pursuant to a qualified domestic relations order (QDRO), and such distributions therefore become taxable income to that spouse. The spouse receiving the distribution pursuant to the QDRO is also known as an "alternate payee". Secs. 402(e)(1)(A), 414(p)(8).

A domestic relations order (DRO) qualifies as a QDRO only if it: (1) Creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan; (2) clearly specifies facts required by section 414(p)(2); and (3) does not alter the amount or form of the plan benefits. Sec. 414(p)(1)-(3). In addition, the DRO must be presented to the plan administrator, who must determine whether it is a QDRO. Sec. 414(p)(6). Finally, under section 402(e)(1)(A) an alternate payee is treated as the distributee of a distribution from a qualifying plan only if the distribution is made to the alternate payee under a QDRO. The parties do not

dispute that the order constitutes a QDRO, and we agree that the order satisfies the requirements of section 414(p).

Nonetheless, even if the superior court order had not constituted a QDRO under section 414(p), petitioner's interest in the military retired pay would be taxable income to her on the basis of community property law.  See Powell v. Commissioner, 101 T.C. 489, 498 (1993); Eatinger v. Commissioner, supra.

Petitioners do not dispute that the superior court awarded petitioner a community property interest in Mr. Walton's military retired pay and that she received $5,126 pursuant to the QDRO. Instead, petitioners argue that the payments petitioner received for her interest in Mr. Walton's military retired pay are not subject to income tax because the QDRO specified that all taxes should have been withheld from the military retirement pay before it was divided and distributed.  Petitioner draws support for this argument from a paragraph in the factsheet attached to the QDRO which stated in pertinent part:

> i.  The amount payable to a spouse or former spouse under this law is limited to 50 percent of the disposable retired pay.  Please see 10 U.S.C. sec. 1408(a)(2)(C) and (e)(1). [Emphasis added.]

The QDRO defined "net disposable military retirement pay" as "the net after deducting * * * properly deducted Federal, State and [sic] income taxes".  This definition is consistent with the plain language of 10 U.S.C. sec. 1408(a)(4)(C) (1988), as it was

in effect when the superior court entered both the final judgment and the QDRO.

Congress recognized that subtracting tax withholdings from the computation of disposable retired pay created unfairness to the service member's spouse.  H. Rept. 101-665, at 279-280 (1990).  Accordingly, Congress amended the definition of "disposable retired pay" such that the disposable retired pay is not reduced by income taxes withheld.  10 U.S.C. sec. 1408(a)(4) (Supp. III 1991); NDAA sec. 555(b)(3), (e)(2).  This amendment, however, is effective only for divorces entered into on or after February 3, 1991, which is after both petitioner's final judgment and the QDRO and is therefore not applicable in the instant case. See 10 U.S.C. sec. 1408(a)(4) (Supp. III 1991); NDAA sec. 555(b)(3), (e)(2).

The calculation of disposable retired pay, however, does not mean that petitioner's allotment is not taxable, nor does it mean that petitioner's allotment is exempt from tax because tax was already withheld on Mr. Walton's allotment.  Title 10 U.S.C. sec. 1408(a)(4) (2006) merely defines petitioner's property rights in the military retired pay, not the tax consequences of her receipt of the benefit.  Because the State of California is a community property State, petitioner is treated as having earned the distributions she is currently receiving.  Accordingly,

petitioner is liable for tax on those distributions, regardless of the terms of the QDRO.

Petitioner essentially argues that her disbursement is being subjected to double taxation. Petitioner, however, did not produce any evidence, and the record is void of any evidence, that double taxation occurred. Petitioner did not provide any evidence about the amount of the pension which was included in Mr. Walton's taxable income. Moreover, there is nothing in the QDRO stating that petitioner's interest in Mr. Walton's military retired pay is not taxable or has already been subject to tax. As indicated above, the factsheet provides in pertinent part that "Taxes may be held only from the Air Force retiree's pay. Funds may not be held for taxes from the ex-spouses [sic] portion." This supports respondent's argument that taxes were not withheld on petitioner's portion of the military retired pay.

On the basis of the law as it was in effect on the date of petitioner's final judgment and the date of the QDRO, petitioner's interest is calculated on Mr. Walton's military retired pay less income tax withheld. Petitioner provided no evidence that income taxes were withheld from her portion of the military retired pay. As explained earlier, petitioner's interest is taxable. Accordingly, we conclude that the $5,126 petitioner received in 2001 for her interest in Mr. Walton's military retired pay is includable in petitioners' gross income.

To reflect the foregoing,

Decision will be entered

for respondent.

Reviewed by the Court.

COLVIN, COHEN, WELLS, FOLEY, VASQUEZ, GALE, THORNTON, MARVEL, HAINES, WHERRY, KROUPA, GUSTAFSON, and PARIS, JJ., agree with this majority opinion.

MORRISON, J., did not participate in the consideration of this opinion.

HOLMES, J., concurring:  Dear Reader--if you have made it this far, you may reasonably ask "Where's the beef?"  Why did the Tax Court assemble in conference to decide unanimously that payments under a divorce agreement were taxable income to Maria Mitchell--a question already resolved on a nearly identical record for the immediately preceding tax year?

Tucked away in footnote 2 is the answer:  A solid majority of the Court does not wish to address the question of whether our decision in a small tax case collaterally estops future litigation of the same issue between the same parties in a later-filed regular tax case.  Our opinion today technically avoids the issue, but in doing so throws into question at least three summary opinions,[1] two of our Rules,[2] and one memorandum opinion[3] where we have given or said we would give S-case decisions collateral-estoppel effect.  It should, I think, be construed by those who read and rely on our opinions as standing for the proposition that half our Court's caseload--cases leading to

---

[1] See Voss v. Commissioner, T.C. Summ. Op. 1978-288 at 6 (collateral estoppel "in no way conflicts with the 'no precedent' provisions of section 7463(b)"); Wilkerson v. Commissioner, T.C. Summ. Op. 2004-99 at 6 n.7 (section 7463(b) doesn't "necessarily preclude application of the doctrines of res judicata and collateral estoppel"); Gilmore v. Commissioner, T.C. Summ. Op. 2005-38 at 1 n.1 (applying collateral estoppel despite section 7463(b)).

[2] Rules 50(g),152(c).

[3] Ginalski v. Commissioner, T.C. Memo. 2004-104.

-14-

decisions in S cases--are like a "restricted railroad ticket, good for this day and train only."[4]  All agree that the Code makes S-case decisions nonprecedential, but today's opinion may suggest more radically that they are without effect on future litigation at all.

I write separately to explain the issue that we are avoiding today, and how I think it should have been resolved.[5]

I.

The facts in this case were largely undisputed and, as the trial judge who heard the case, I do not disagree with the majority's recitation of them here.  But the case doesn't really begin with Mitchell's 2001 taxes.  Mitchell began receiving the pension payments due under the QDRO in 1991.  She consistently reported none of them on her tax returns until 2002, when the IRS sent her a notice of deficiency challenging her failure to report the payments on her 2000 tax return.

Mitchell began a case in our Court, and chose for it to be a small tax case (S case) under section 7463.  One of our Court's special trial judges heard Mitchell's S case and, as the majority's footnote 2 mentions, we issued the opinion as <u>Mitchell</u>

---

[4] <u>Smith v. Allwright</u>, 321 U.S. 649, 669 (1944) (Roberts, J. dissenting).

[5] See <u>Ballard v. Commissioner</u>, 544 U.S. 40, 63 (2005) ("To the extent that the individual judge disagrees with his colleagues, he is free to file a dissenting opinion repeating or borrowing from his initial decision.").

v. Commissioner, T.C. Summ. Op. 2004-160 (Mitchell I).  In
language strikingly similar to that used by the majority today,
we held that the QDRO didn't actually say that Mitchell's portion
of Walton's retirement pay was nontaxable, only that her share of
it was to be computed after Walton's own taxes on the full amount
were withheld.  Finding nothing in the Code that would have
excluded the payments from Mitchell's gross income, we concluded
then as now that Mitchell had to pay tax on them.

When Mitchell filed her 2001 joint income tax return with
her second husband (which, I want to note, she filed well before
we issued Mitchell I), she again did not include the pension
payments that she had received under the QDRO.  After receiving
another notice of deficiency, she again filed a petition with
this Court.  This time, she specifically designated her case a
"regular" one under section 7453, subject to the full set of
rules, procedures, and appeal rights as all other regular cases.

Once the decision in Mitchell I became final, the
Commissioner amended his answer in this case and asserted
collateral estoppel as an affirmative defense.  This squarely
placed at issue a question left open more than a quarter century
ago by Sherwood v. Commissioner, T.C. Memo. 1979-149:  Does our
Court's decision in an S case collaterally estop the losing party
in later litigation?  A bit of research showed that we had
addressed the issue before in summary opinions, and at least

obliquely in one memorandum opinion.  And we seemed to have answered the question by rule when it came to S cases decided by bench opinions or dispositive orders.  It seemed reasonable to view this second <u>Mitchell</u> case as a good opportunity to provide citable precedent on the collateral-estoppel effect of S cases decided by summary opinion.  We asked both parties to brief the issue, and gave the Commissioner's counsel enough time to seek review from the IRS National Office to make certain that the views he presented reflected the IRS's considered opinion.

The transcript of the trial consists of 30 pages, only 11 of which show testimony or the receipt of evidence.  The only really important question was the first one:

> The Court:  Now, are there any differences between this tax year, which is for 2001, and the tax year that [the special trial judge] wrote about?

> *   *   *   *   *   *   *

> Mr. Mitchell:  The only thing I think that may have changed is there may be a little slight difference in the amount that she received.  But I don't think so.

## II.

### A.

I begin by outlining the key characteristics of S cases.  One of the most important is that S status is voluntary.  When Mitchell filed her first petition in our Court, she used a form we had specifically designed for small cases, but with a box that

she had only to check to choose regular-case status.[6]  Either party may also ask that we remove this designation any time before trial.  Rule 171(c).[7]  But if the case remains an S case all the way to a final decision, neither party is allowed to appeal it to a United States Court of Appeals as he could if it were a decision in a regular case.  Sec. 7481(b).

Congress considered this point carefully before giving taxpayers the option of choosing S-status for their cases.  The S designation has benefits for taxpayers who choose it--they get relaxed rules of evidence and procedure, a longer list of cities from which to choose a place of trial, and usually a speedier decision.  See S. Rept. 91-552, at 302-304 (1969), 1969-3 C.B. 423, 614-15.  And each of these features makes access to the court system easier and less costly for taxpayers with small claims, a category into which most Tax Court cases currently fall.  But increasing access to Tax Court for these taxpayers increases the likelihood that sometimes unforeseen but

---

[6] We recently adopted a new form that requires a taxpayer to choose between small-case and regular-case procedures.  If he doesn't, the default rule is to designate his case a regular one. Tax Court Form 2 (March 2008).

[7] We also must remove the S designation after trial begins but before the decision becomes final if the case no longer meets the jurisdictional requirements.  Sec. 7463(d).  And Rule 173(b) now requires the Commissioner to file an answer in S cases, which also increases the probability that we will notice small cases raising novel legal issues and move them to a regular-case track under section 7463(d).

complicated questions of tax law might be decided incorrectly, especially when the volume of cases increases and they are not often tried on both sides by professionals. By enacting section 7463, Congress chose to balance these competing effects on accuracy and cost by allowing easier access for taxpayers and eliminating the right of appeal--making the stakes lower for the IRS by eliminating any precedential effect an S case might otherwise have. See id. at 303, 1969-3 C.B. at 615.

But any increase in the probability of error is reduced by our Rules. Apart from the elimination of the right of appeal and precedential effect, we decide S cases very much like regular cases. In an S case, just as in a regular case, the judge has to prepare an oral or written "summary of the facts and reasons for the proposed disposition of the case." Rules 182(a), 152. A summary opinion like the one in Mitchell I is submitted to the chief judge (or his designee) for review before decision is entered. Rule 182 (a). This review gives time for the chief judge to direct that "such report shall be reviewed by the Tax Court." Section 7460(b). If so, the opinion would be considered and voted on by all the Court's presidentially appointed judges in active service. And whether the opinion in an S case is written or oral, the decision in the case becomes final 90 days after it is entered. Section 7481(b). During this time, either

party may file a motion to vacate or a motion to revise the decision. Rule 162.

## B.

Issue preclusion or collateral estoppel is a doctrine with deep roots in our legal system. The doctrine is easy to state: "when an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or different claim." 1 Restatement, Judgments 2d, sec. 27 (1982). It stems from the understandable policy that a dispute once resolved should stay resolved. It promotes judicial economy and, if justice consists in part of reaching the same result in similar cases, it is also an instrument of justice. In Peck v. Commissioner, 90 T.C. 162, 166-67 (1988), affd. 904 F.2d 525 (9th Cir. 1990), we listed the requirements for applying collateral estoppel:

> (1) The issue in the second suit must be identical in all respects with the one decided in the first suit.
>
> (2) There must be a final judgment rendered by a court of competent jurisdiction.
>
> (3) Collateral estoppel may be invoked against parties and their privies to the prior judgment.
>
> (4) The parties must actually have litigated the issues and the resolution of these issues must have been essential to the prior decision.

(5) The controlling facts and applicable legal rules must remain unchanged from those in the prior litigation.

See Montana v. United States, 440 U.S. 147, 155 (1979) (listing similar elements).

Mitchell I seems to have them all:

- The issue is the same;

- the decision in Mitchell I is final;

- the parties are identical;

- the issue was actually litigated and was essential to the outcome; and

- neither the terms of the QDRO nor the relevant law changed from one year to the next.

The Supreme Court told us just earlier this year that "[t]he preclusive effect of a federal-court judgment is determined by federal common law." Taylor v. Sturgell 128 S. Ct. 2161, 2171-72, n.6 (2008). We look to caselaw, the Restatement, and treatises for sources of that law. And, as with most common-law doctrines, there are exceptions to the general rule against relitigation of a decided issue. One that is relevant here denies estoppel when "[t]he party against whom preclusion is sought could not, as a matter of law, have obtained review of the judgment in the initial action." 1 Restatement, Judgments 2d, sec. 28(1) (1982). The Ninth Circuit--the circuit to which this case is appealable--has construed the availability of review specifically to mean "the possibility of a chain of appellate

review."  Wehrli v. County of Orange, 175 F.3d 692, 695 (9th Cir. 1999) (citation omitted).  If collateral estoppel applied in cases with no possibility of appellate review, the court reasoned, it would be too easy for a party to become bound by an arbitrary or incorrect decision not just in that specific case, but in any future litigation as well.  Id.  And a leading treatise on the subject flatly states that "inability to obtain appellate review * * * does prevent preclusion."  18 Moore, Moore's Federal Practice, par. 132.03[4][k][i], at 132-122 (3d ed. 1997).

This means that the Commissioner has a problem--Congress, by enacting section 7463(b), has shattered whatever chain of appellate review might otherwise have been available to the Mitchells after our Court decided Mitchell I.  And it might conceivably be argued that section 7463's prohibition on treating decisions in S cases "as a precedent" itself somehow bars using those decisions as the basis for defenses of collateral estoppel or *res judicata* or law of the case.

I will therefore sort the possible objections[8] to giving collateral-estoppel effect to our decisions in S cases into three parts:

- Section 7463;

- the absence of appealability; and

- the peculiar problem of applying collateral estoppel in a case appealable to the Ninth Circuit because of Wehrli.

III.

A.

Section 7463(b) states that a "decision entered in any case in which the proceedings are conducted under this section shall not be reviewed in any other court, and shall not be treated as a precedent for any other case."  This language is prominently

---

[8] The majority's stated explanation is that it won't address the Commissioner's collateral-estoppel defense "because this case was tried and presents a legal issue."  Majority op. note 2.  Neither of these is very persuasive.  Collateral estoppel is an affirmative defense, not a defect in pleading of the sort that's waived if not raised before trial.  Cf. Fed. R. Civ. P. 12(h).  It's also a defense that can be raised for the first time on appeal, during oral argument, even in a supplemental appellate brief--so "long as it is raised at the first reasonable opportunity after the rendering of the decision having the preclusive effect."  Aetna Cas. & Sur. Co. v. Gen. Dynamics Corp., 968 F.2d 707, 711 (8th Cir. 1992).  Nor should the fact that the key issue is a question of law, rather than a question of fact, make any difference.  Collateral estoppel applies "when an issue of fact or law is actually litigated and determined by a valid and final judgment..." 1 Restatement, Judgments 2d, sec. 27 (1982) (emphasis added).  And we have said the same thing ourselves.  Bertoli v. Commissioner, 103 T.C. 501, 508 (1994); Meier v. Commissioner, 91 T.C. 273, 283 (1988).

quoted in every summary opinion we issue, putting both parties on notice that they can't appeal.

But what exactly does the phrase "shall not be treated as a precedent for any other case" mean?  One possible reading is to look at section 7436(c), which provides that our decisions in S cases at the end of proceedings to determine employment status "shall not be treated as precedent for any other case not involving the same petitioner and the same determinations."  And then one might consider the language of local rules in many circuit courts that prohibit citation of unpublished or nonprecedential opinions (at least for cases decided before 2007).[9]  The Ninth Circuit's Rule 36-3(c) is typical:[10]

> Unpublished dispositions and orders of this Court issued before January 1, 2007 may not be cited to the courts of this circuit, except in the following circumstances.
>
> (i) They may be cited to this Court or to or by any other court in this circuit when relevant under the doctrine of law of the case or rules of claim preclusion or issue preclusion.

---

[9] Federal Rule of Appellate Procedure 32.1 restricts courts from forbidding the citation of unpublished or nonprecedential opinions.  However, the advisory committee noted that this rule does not say anything about the precedential weight of such opinions.

[10] See Cooper, "Citability and the Nature of Precedent in the Courts of Appeals: A Response to Dean Robel", 35 Ind. L. Rev. 423, 432-33 (2002).

One might argue, on the principle of *inclusio unius est exclusio alterius*, or the duty to refrain from reading into the statute a phrase that Congress has left out,[11] that this makes the best reading of section 7463(b) one that would make our summary opinions uncitable <u>even for</u> purposes of *res judicata*, collateral estoppel, law of the case, or the other purposes listed by the Ninth Circuit.

I think such a reading is wrong. First, barring something unusual in the context or the structure of the Code, legal terms like "precedent"--even when used in the Internal Revenue Code-- should be read as having their ordinary meaning to lawyers. <u>Kornman & Associates, Inc. v. United States</u>, 527 F.3d 443, 451 (5th Cir. 2008). And "treating a case as precedent" means, to a lawyer, not a prohibition on citing it altogether, but on citing it as stating "a point or principle of law * * * decided or settled by the ruling of a competent court in a case in which it is directly and necessarily involved," Black's Law Dictionary 1443 (8th ed. 2004), or considering the case "as furnishing a rule or authority for the determination of an identical or similar case afterwards arising, or of a similar question of law." <u>Id.</u> at 1214.

---

[11] See <u>Russello v. United States</u>, 464 U.S. 16, 23 (1983), (also saying that where Congress has included a phrase in one section of a statute that it omitted in another we should presume that it acted intentionally in the disparate inclusion or exclusion).

A good illustration of this is our opinion in <u>Ginalski v. Commissioner</u>, T.C. Memo. 2004-104.[12]  In that case, the taxpayer filed an S case to contest the Commissioner's determination of a deficiency in her 1993 and 1994 taxes.  She lost, for reasons explained in a summary opinion.  The Commissioner came to collect, and she demanded a collection due process hearing.  The Commissioner argued that she was barred from again challenging her underlying liability at the hearing, but she thought she could trump him by citing section 7463.  We disagreed:

> Summary Opinions of this Court contain the caveat:  "[The] case was heard pursuant to the provisions of section 7463 of the Internal Revenue Code in effect at the time that the petition was filed.  The decision to be entered is not reviewable by any other court, and this opinion should not be cited as authority."  Petitioner has mistakenly interpreted that caveat to mean that the outcome of her Tax Court proceeding involving the same taxable years (1993 and 1994) is not binding with respect to her proceeding under sections 6320 and 6330.  Although this Court's decision for petitioner's 1993 and 1994 tax years is not precedential for any other case, it is final and determinative as it relates to petitioner's liability for those years.  It appears that petitioner believes that the limitation on citing Summary Opinions as precedent deprives them of the effect of *res judicata*. * * * [Id.]

Consider as well the Third Circuit's rule on citing nonprecedential opinions, which seems to be unique among the

---

[12] See also <u>Gilliam v. U.S.</u>, 216 Ct. Cl. 464, 578 F.2d 1389 (1978) (an unpublished decision noting that res judicata bars relitigation of a claim decided in an S case in our Court).

circuit courts[13] in stating only that "[t]he Court by tradition does not cite to its not precedential opinions as authority. Such opinions are not regarded as precedents that bind the Court."  3d Cir. Int. Op. Proc. 5.7.  That court, too, gave little time to an argument that a refusal to treat an unpublished opinion as precedent meant that it couldn't be relied on in later litigation between the same parties:

> We recognize that an unpublished opinion has no precedential value and should not be cited as authority in a subsequent case.  * * * The reference made here is necessary, however, to record the law of this case.

Edge v. Schweiker, 814 F.2d 125, 127 n.1 (3d Cir. 1987); see also Green v. Commissioner, 201 F.3d 447 (10th Cir. 1999)(noting in dicta that " §7463(b) does not alter traditional principles of collateral estoppel"), affg. without published opinion T.C. Memo. 1998-274.

There would also be some perverse consequences of construing the phrase "not be treated as a precedent" in section 7463(b) as a bar on subsequent citation for purposes of *res judicata*, collateral estoppel, and law of the case.  Section 6512 generally deprives other federal courts of jurisdiction over refund cases for tax years that have been the subject of deficiency cases in our Court.  But there are exceptions:  Section 6512(a)(2), for

---

[13] Cooper, supra note 10, at 431.

example, allows a refund claim for the same year "as to any amount collected in excess of an amount computed in accordance with the decision of the Tax Court which has become final." Are courts to read section 7463(b) as prohibiting the use of our decisions in S cases to establish this jurisdictional prerequisite when those decisions are explained by summary opinions? The answer is "no." Section 7463(b) has no effect on rules of collateral estoppel and *res judicata*, because they are rules about the finality of judgments, not rules on the weight or binding authority of precedent.

And this leads to a point making the majority's reluctance to decide the issue even odder: Two of our own rules parallel pretty closely the noncitation rules of the circuit courts--with no exclusion for S cases. Rule 50(g) prohibits treating dispositive unpublished orders as precedents, and Rule 152(c) does the same for unpublished oral opinions, except "for purposes of the application of the doctrine of res judicata, collateral estoppel, or law of the case."[14] (The quotation is from Rule 152(c); Rule 50(g) puts the list in a different order and throws

---

[14] Rule 152 expressly governs cases where a special trial judge is "authorized to make the decision of the Court pursuant to Code section * * * 7443A(b)(2)." And section 7443A(b)(2) refers to any proceeding under section 7463--precisely the section that describes our S cases. Rule 152(c) also doesn't distinguish between oral opinions in regular and S cases--it encompasses both with the phrase "Opinions stated orally in accordance with paragraph (a) of this Rule."

in "or other similar doctrine.")  Even if we silently rue the adoption of those rules, they remain in effect--leaving today's opinion to throw into question only the use of our written-and-released-on-the-internet summary opinions--presumably the most thoughtfully constructed S-case decisions--as a basis for collateral estoppel.[15]

But even if section 7463(b) is no bar to applying collateral estoppel to decisions in S cases explained by summary opinions, would "the principles of federal common law" balk at using Mitchell I to collaterally estop Mitchell when she had no right to appeal our decision?

B.

---

[15] Consider how the result today might affect a case like Ginalski.  The Commissioner in that case had to show that Ginalski had had a prior opportunity to contest her deficiency. One way would be to show a certified mailing list of notices of deficiency with her name on it; another would be to put on a credible eyewitness to testify that Ginalski had actually received the notice.  But a perfectly reasonable (and much more efficient) way ought to be by showing via citing a Summary Opinion that Ginalski had actually litigated a deficiency case for the tax year in question--there being no way to start a deficiency case without actually receiving a notice of deficiency.  And that seems to have been what the Commissioner was doing:  Thus our reference to Ginalski's having received a deficiency notice, filed a petition, and had a final decision entered against her.  Ginalski, T.C. Memo 2004-104.  In Ginalski, where the taxpayer was contesting the same liability for the same tax year, the legal pigeonhole was res judicata; I can't see any reason we should treat collateral estoppel differently.

As I've already noted, one of the exceptions to the general rule giving earlier judgments collateral-estoppel effect in later litigation is if "[t]he party against whom preclusion is sought could not, as a matter of law, have obtained review of the judgment in the initial action."  1 Restatement, Judgments 2d, sec. 28(1).  That leads to three related questions:

- When those authorities ask whether a party could not "as a matter of law" obtain review, do they mean that a party choosing a procedure without a right of appeal cannot be collaterally estopped?

- Are there exceptions to the Restatement's requirement of reviewability that are analogous to our S cases?

- Does "reviewability" mean the same as "appealability"?

Because our Court hasn't answered these questions before, we should be looking to analogous procedures in other areas of law where simplified litigation often comes attached to limited rights of appeal.  Most of these spring from arbitration and administrative law.

Begin with arbitration.  Cases discussing the collateral-estoppel effect of arbitration awards are especially interesting because arbitration awards, like our decisions in S cases, are typically not appealable.  Learning whether they give rise to collateral estoppel may well answer the first question that we posed:  Can a party choosing a procedure without a right of

appeal be collaterally estopped?  In answering this question,
courts generally look at what the parties intended.  This is no
surprise since most arbitration agreements are "creature[s] of
contract," and participants in them voluntarily accept limited
judicial review over the issues they agree will be arbitrated.
Convalescent Ctr., Inc. v. Dept. of Income Maint., 544 A.2d 604,
609-10 (Conn. 1988).  Courts reason that when the parties
themselves agree that a decision will be final, the decision
should be given the same weight as a court-rendered judgment.[16]
Corey v. Avco-Lycoming Div., 307 A.2d 155, 160-61 (Conn. 1972);
see also Benjamin v. Traffic Executive Association E. R.R., 869
F.2d 107, 113 (2d Cir. 1989) (collateral estoppel of arbitration
decision allowed in part because parties agreed to the
procedures).

There is an important exception to this default rule:  The
courts have sometimes denied collateral estoppel when a party
tries to use an unappealed arbitration award to preclude a
federal statutory civil-rights claim.  See, e.g., Alexander v.
Gardner-Denver Co., 415 U.S. 36 (1974); McDonald v. City of West
Branch, 466 U.S. 284 (1984) (no collateral estoppel over claim

---

[16] This is only true, however, in future litigation between
the same parties.  Because of the informal nature of arbitration,
nonmutual collateral estoppel--where a nonparty uses the prior
decision against one of the parties to that decision--is
generally not available for arbitration decisions.  E.g.,
Vandenberg v. Superior Court, 982 P.2d 229, 239-40 (Cal. 1999).

brought under 42 U.S.C. section 1983.  But see <u>Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.</u>, 473 U.S. 614, 628 (1985) (arbitration presumptively competent to resolve certain other statutory claims).  Such cases remind us that rules about preclusion are usually judge-made default rules--rules that can be upended when "Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue."  <u>Id.</u> at 628.

Courts follow a similar approach in cases analyzing the collateral-estoppel effect of administrative-agency decisions. There the same principle applies:  Collateral estoppel of a decision with limited or nonexistent judicial review should be allowed only when the parties voluntarily decide to submit their dispute to the agency for decision.  See <u>Convalescent Center</u>, 544 A.2d at 611.

These cases strongly suggest that petitioners who choose S-case status should be treated the same as parties who opt to arbitrate disputes or take them to an administrative agency--it is their choice that deprives them of the right to seek appellate review, not (to use the Restatement's careful formulation) "a matter of law."  Seen with this parallel in mind, S-case petitioners like Mitchell should not be able to defeat the affirmative defense of collateral estoppel because they themselves chose to give up their right of appeal.

What makes this analogy less than perfect is that the choice of S-case status is left up to the petitioner, and not the mutual agreement of the petitioner and the Commissioner. Our rules do give the Commissioner the right to move for an order deleting the S-case designation, Rule 171(c), and of course in this case it is the petitioner against whom the doctrine of collateral estoppel is being urged. But in <u>Wehrli</u>, the election of an administrative hearing was likewise the free choice of the party against whom collateral estoppel was later invoked. <u>Wehrli</u>, 175 F.3d at 693.

So, while I think we should view the voluntary choice of S-case status as a strong argument in favor of allowing decisions in S cases to collaterally estop later litigation, it's not necessarily a clinching one. I'd therefore move on to the second question: Are there exceptions to the Restatement's requirement of reviewability for situations analogous to our S cases?

The comments to the Restatement make the scope of this requirement seem quite broad:

> "There is a need for an * * * exception to the rule of preclusion when the determination of an issue is plainly essential to the judgment but the party who lost on that issue is, for some other reason, disabled as a matter of law from obtaining review by appeal or, where appeal does not lie, by injunction, extraordinary writ, or statutory review procedure."

1 Restatement, Judgments 2d, sec. 28(1), cmt. a (1982).[17]

---

[17] See <u>Peterson v. Cal. Dept. of Corr. & Rehab.</u>, 451 F. Supp. 2d 1092, 1104 (E.D. Cal. 2006) (writ of mandamus is

(continued...)

In a gentle criticism of this comment, however, a leading treatise distinguished between decisions of a sort that ordinarily cannot be appealed and decisions that are ineligible for appeal only because of some special circumstance (e.g. a particular case's becoming moot while on appeal):

> Quite different calculations attend the question whether issue preclusion can rest on a judgment that falls into a category that cannot generally be appealed. Although it is tempting to suggest a broad general principle that preclusion is never appropriate, [and here the treatise cites to the Restatement] the matter is not so simple. At most, the unavailability of appeal may count as an important factor in contemplating preclusion, and even that view must be approached with caution * * *.

18A Wright & Miller, Federal Practice and Procedure, Jurisdiction 2d sec. 4433, at 108-09 (2002) (fn. refs. omitted).

The treatise gives two counterexamples to the "broad general principle" of the Restatement. The first is peculiar to a very small set of cases--those within the original jurisdiction of the Supreme Court. Though collateral estoppel might not be exactly the right pigeonhole in which to put that Court's deference to its own previous findings of fact, a recognition of the benefits of rules of finality means that "[t]his Court does not reopen an

---

[17](...continued)
satisfactory method of review); <u>M.J. Woods, Inc. v. Conopco Inc.</u>, 271 F. Supp. 2d 576, 582 (S.D.N.Y. 2003) (judicial review of arbitration award for legality and general fairness is adequate).

adjudication in an original action to reconsider whether initial
factual determinations were correctly made."  Arizona v.
California, 460 U.S. 605, 623-24 (1983).

The second counterexample--though flowing from the same
spring of judicial desire for finality and consistency--is closer
to what we have here.  In the old case of Johnson Co. v. Wharton,
Jr., & Co., 152 U.S. 252 (1894), the Supreme Court faced a
question exceptionally similar to ours:  Wharton had won a
judgment against the Johnson Company for infringing its patent,
but the Johnson Company had no right to appeal because the amount
involved was under a jurisdictional limit.  When Wharton sued
again--this time for a larger amount--and tried to use the first
judgment to collaterally estop the Johnson Company from
challenging the fact of infringement, the Johnson Company
squawked that the absence of even the possibility of appellate
review in the first case made estoppel improper.

The Supreme Court disagreed.  The doctrine of collateral
estoppel,

> so essential to an orderly and effective
> administration of justice, would lose much of
> its value if it were held to be inapplicable
> to those judgments in the Circuit Courts of
> the United States which, by reason of the
> limited amount involved, could not be
> reviewed by this court.

> \* \* \* Nor can the possibility that a party
> may legitimately or properly divide his
> causes of action, so as to have the matter in
> dispute between him and his adversary
> adjudged in a suit that cannot, after
> judgment, and by reason of the limited amount
> involved, be carried to a higher court,
> affect the application of the general rule
> \* \* \*.

Id. at 261; see Winters v. Lavine, 574 F.2d 46, 62 (2d Cir. 1978)
(Johnson Co. still good law).

We thus answer the second question that we posed by
concluding that there are indeed situations where the "full chain
of appellate review" is not necessary to give an earlier decision
collateral-estoppel effect.

But we don't rest entirely on this old, and not-very-often-
cited precedent,[18] nor on Mitchell's voluntary choice of S-case
status for Mitchell I. We rely as well on the peculiar nature of
our Court's internal system for reviewing the work of individual
judges.

S cases--even though not appealable--are reviewable.
Section 7443A(c) authorizes special trial judges to issue
decisions, subject to "such conditions and review as the court
may provide." Long ago, Chief Judge Drennen issued General Order
No. 2, 54 T.C. VI (1970), exercising his authority under section

---

[18] One must recognize that, despite its antiquity, Johnson
Co. is a Supreme Court precedent that is on point. I'd therefore
follow it even if the Restatement disagreed--in matters of
federal common law, higher-court caselaw is the law we have to
follow.

7444(c) to create a Small Tax Case Division to have "supervision of commissioners of the Court." The order went on to delegate "to the judge in charge of the Small Tax Case Division the authority to review and, in his discretion, approve the proposed findings of fact and opinion in any small tax case in which the trial is conducted by a commissioner of the court, and to sign in his name the decision to be entered therein."

Over the years, of course, commissioners became special trial judges and our chief judges received, and promptly exercised the power to delegate to them the authority to enter decisions in S cases. See Delegation Order No. 11, 86 T.C. VII (1986). But the parallel treatment of summary opinions and reports from the regular divisions continued. Delegation Order No. 11 directed (except in cases decided by bench opinion) that decisions be made only "after the Special Trial Judge prepares a summary of the facts and reasons for the proposed disposition of the case and submits said summary to the Chief Judge, or to another Judge designated by the Chief Judge." Our current Rule 182 directs the summary to be submitted in exactly the same way. All this seems to be very similar to the procedure in regular cases, or S cases tried by regular judges, cf. section 7459, in that the report is submitted before the decision is entered. Given General Order No. 2's creation of a Small Tax Division under section 7444(c), the most straightforward reading of the

relevant provisions is that a report in the form of a summary opinion, like a report in the form of a memorandum opinion or proposed division opinion in a regular case, can be referred to the Court for review.

In any event, the *purpose* of reviewing summary opinions, whether drafted by special or regular or senior judges, surely is the same as the purpose of reviewing regular Tax Court opinions --more eyes to check for typos or infelicities of expression or bits of illogic of the "oh-of-course-how-could-I-have-overlooked-it" variety. And, very occasionally, for suggestions of legal questions to refer to the full Court to increase the uniform and accurate application of tax law in the country.[19]

We thus answer the third question that we posed by concluding that appealability is not synonymous with reviewability.

Mitchell I was not appealable. That's true. But its nonappealability, as in the arbitration cases, was a choice made

---

[19] Some S cases have even produced T.C. opinions. See, e.g., Kallich v. Commissioner, 89 T.C. 676 (1987) (decision on motion to reinstate S designation); Carstenson v. Commissioner, 57 T.C. 542 (1972) (relation back of amended petition to original filing date); Dressler v. Commissioner, 56 T.C. 210 (1971) (denying Commissioner's request to have S designation removed);. These opinions are certainly not appealable given section 7463(b)'s proscription on review by any other court. Their rarity suggests that our system for filtering out of the S-case channel any cases with keen precedential significance, set up decades ago by our ancestors in office, has actually worked pretty well.

by a party and not imposed by law.  Mitchell I was also not reviewable by a higher court, said by the Restatement to be a requirement for collateral estoppel.  But if reviewability by a higher court is a requirement, it's a requirement with some exceptions, one of which--supported by some seemingly good precedent--is the absence of appealability because of jurisdictional limits imposed by statute on the appellate courts. And Mitchell I (or any of our S cases) was, even if not appealable, still reviewable.  See secs. 7443A(c), 7460(b).

Unlike much of tax law, with its detailed if tangled skein of statute, regulation, and administrative procedure, the rules of collateral estoppel in federal courts are generally fashioned by judges guided by reasonableness and precedent.  Though the majority opinion ensures there will continue to be no precedent quite on point, I don't think that the absence of appealability by itself should prevent the decision in an S case from collaterally estopping relitigation of the same issue.

C.

Even if the majority had gone along with me this far, there still would have been one last obstacle:  Wehrli's plain statement that preclusion requires the availability of appellate review.  Wehrli, 175 F.3d at 695.  The case before us is appealable to the Ninth Circuit, and under Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir.

1971), we do not enter decisions that will surely be reversed. Lardas v. Commissioner, 99 T.C. 490, 495 (1992).

But I am confident that Wehrli would have been distinguishable.  The Ninth Circuit was particularly concerned about the possible arbitrariness of an unreviewable administrative decisionmaker:  "individual hearing officers are capable of occasional arbitrary action even if they are judges." Wehrli, 175 F.3d at 695.  But there was nothing in the administrative process that Wehrli chose that is remotely similar to the review of reports in our Court, already described at length in the previous section, that is an effective check on arbitrariness.

And, as the Ninth Circuit also emphasized, the decision in Wehrli was the decision of an administrative agency.  Id.  The rules of preclusion are somewhat different for decisions of administrative agencies, and one significant way they are different is the importance of judicial review as a check on agency arbitrariness.  See United States v. Utah Constr. & Mining Co., 384 U.S. 394, 422 (1966).  Mitchell I was, in contrast, itself a decision of a court exercising judicial, not "executive, legislative, or administrative, power."  Freytag v. Commissioner, 501 U.S. 868, 890-91 (1991).

Another difference is that the decision discussed in Wehrli was the result of a very informal process--the hearing involved

was not even recorded. Courts have often held that there must be a record, whether of administrative or judicial decisionmaking, for there to be preclusion in later litigation. This requirement developed out of the Supreme Court caselaw setting the minimum requirements for an administrative decision to have collateral-estoppel effect: The agency must have acted in a judicial capacity, the issues decided must have been properly before the agency, and the parties must have had an adequate opportunity to litigate those matters. Utah Constr. & Mining Co., 384 U.S. at 422. Part of the adequate-opportunity-to-litigate requirement is that there be some sort of review of the decision, which in turn requires a record of the proceedings. Wehrli, 175 F.3d at 695. The record need not be written--a tape recording is enough, Peterson v. Cal. Dept. of Corr. & Rehab., 451 F. Supp. 2d 1092, 1105-07 (E.D. Cal. 2006)--but it does need to exist so that there is some way for a reviewer to review, and of course for a court in a later case to figure out exactly what issues were decided and how.

Our S cases come with a complete record of the proceedings. Every S case starts with a petition listing the issues in dispute. If an S case goes to trial, there is a transcript. Rule 150(a). The parties might even submit briefs. Rule 151(a). And no matter how small, every decision in an S case is explained by a judge who must prepare a summary of his reasoning. Section

7463(a).  This means that every S case has a record enabling the judge in a later case to easily see what issues were actually litigated and how they were decided.

I would conclude from this that Wehrli is distinguishable and would use this case to hold that decisions in S cases collaterally estop relitigation.  Holding to the contrary only encourages duplication of effort.  And although there may be some case some day that would warrant an exception to the usual rule against that vice, giving preclusive effect to our decisions in S cases would be more consistent with precedents in other areas, and similarly conserve--if only at the margin--judicial resources.

IV.

Our tax system requires an annual reporting of income and deductions and, for most people, this requires annual reporting for each calendar year separately.  But there are many questions that, answered for one year, might affect many later years--are payments from an ex-spouse made under a divorce decree deductible alimony or a nondeductible property settlement?  Is the interest on a bond issued by a public authority tax exempt or taxable?  What is the depreciable cost of a particular capital asset?

This gives rise to cases like Jacobs v. Commissioner, T.C. Summ. Op. 1971-22 (resolving issue for 1966, 1967, and 1968 tax years), followed by Jacobs v. Commissioner, T.C. Memo. 1977-1

(deciding the same issue the same way again for the 1972 and 1973 tax years, plus deciding a new issue), followed by <u>Jacobs v. Commissioner</u>, T.C. Memo. 1980-308 (deciding that no-longer-so-new issue from the second case the same way it had already been decided for the 1974, 1975, and 1976 tax years), followed by <u>Jacobs v. Commissioner</u>, T.C. Memo. 1982-198 (shutting another revisitation of the same issues from the prior cases for the 1977, 1978, and 1979 tax years by using collateral estoppel--and, by that point, section 6673), followed by <u>Jacobs v. Commissioner</u>, T.C. Memo. 1983-490 (applying collateral estoppel yet again on the same issues decided in the preceding cases for 1980, and again imposing damages under section 6673 for abuse of judicial resources.)

There's no reason to encourage this sort of thing.  As the Supreme Court has repeatedly noted:  "A fundamental precept of common-law adjudication, embodied in the related doctrines of collateral estoppel and res judicata, is that a 'right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction . . . cannot be disputed in a subsequent suit between the same parties or their privies.'" <u>Montana</u>, 440 U.S. at 153 (quoting <u>Southern Pac. R. R. v. United States</u>, 168 U.S. 1, 48-49 (1897)).  These doctrines come with general rules limited by exceptions, but the presumption in our

system is that a party can't keep trying the same issue over and over again.

This case gave us a chance to fit the estoppel effect of our summary opinions into the already quite extensive caselaw on the effect of judgments generally.  We should have taken it.


HALPERN, J., agrees with this concurring opinion.